**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANTONIO MARRERO-CRUZ | : | |
| | : | |
| Appellant | : | No. 1584 MDA 2022 |

Appeal from the PCRA Order Entered October 13, 2022
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0005480-2017

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED SEPTEMBER 25, 2023**

Appellant, Antonio Marrero-Cruz, appeals from the order denying his petition for collateral relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. Appellant alleges that his trial counsel was ineffective for failing to investigate and/or call witnesses during his bench trial. We affirm.

## I.

Our memorandum decision affirming Appellant's judgment of sentence sets forth the basic facts underlying this matter:

> This incident was instigated by Angel "Gordo" Melendez ("Gordo"), who borrowed the motor bike of [A]ppellant's son, William Marrero-Rodriguez [("William")], and was involved in an accident. Gordo refused to pay for the repairs or replace the dirt bike. On June 14, 2019, [A]ppellant's son arrived in the Glenside area of Reading to discuss payment for the damages to his dirt bike. Appellant's son spoke with both Luis Salame-Morales ("Luis") and Gordo. Gordo reiterated that he would not pay to repair or replace

the bike, slapped [A]ppellant's son, and kicked his car. Appellant's son left and returned with [A]ppellant and other family members.

When [A]ppellant arrived, he was angry and agitated by Gordo's behavior toward his son. Jorge Salame ("[Jorge]"), Luis' brother, testified that [A]ppellant had a gun in his hand and was making threats. Appellant and Luis argued. Luis testified that [A]ppellant said if the damages to the motor bike were not paid for, he "was going to shoot everybody and break everybody's car." Both men pointed guns at one another. [Jorge] attempted to calm things down. When [A]ppellant threatened Luis, by placing a gun to his head, Jonathan Salame, Luis' son, tackled [A]ppellant. The three men, [A]ppellant, Luis and Jonathan, fell to the ground and struggled over the guns. In the process, a weapon discharged, injuring all three men. Luis and Jonathan ran. Although [Jorge]'s hands were in the air, [A]ppellant fired his gun, hitting [Jorge] in the side of his back. This injury led to hospitalization and medical complications. As a result of the shooting, [Jorge] will be in a wheelchair for the rest of his life.

*Commonwealth v. Marrero-Cruz*, 1648 MDA 2019, unpublished memorandum at *1-2 (Pa. Super. filed June 3, 2020) (citations omitted).

Appellant's son, William, was charged with several crimes for his role in the incident and was convicted following a jury trial of, *inter alia*, prohibited possession of a firearm, carrying a firearm without a license, simple assault, and conspiracy. As our Superior Court decision affirming William's judgment of sentence stated, William argued on appeal that he had not fired any shots.

*Commonwealth v. Marrero-Rodriguez*, 1066 MDA 2019, unpublished memorandum at *3 (Pa. Super. filed April 13, 2020) (quoting William's brief stating that he "didn't shoot anybody"). We note this circumstance because William testified at the PCRA hearing, claiming that he was willing to testify at Appellant's trial. William abandoned his stance that he did not shoot anyone and stated that he would have admitted to firing his gun multiple times

towards Jorge. William was convicted in February of 2019, and his direct appeal was pending when Appellant's bench trial took place in May of 2019.

For his part, Appellant raised self-defense. Because Appellant did not testify at trial, that defense was largely based on the chaotic circumstances surrounding the incident, as well as the testimony of Detective Justin Uczynski, who interviewed Appellant at the hospital. Detective Uczynski testified on direct examination as follows to that conversation:

> Q. Tell me what happened next as part of the conversation you had with [Appellant].
>
> A. During that argument that [Appellant] was having with [Luis], he was tackled [from] behind, and he was knocked to the ground. On the ground[,] he heard a shot. He was able to pull out his gun that he had on him, and he explained that a person, a male in white pants, had approached him and pointed a gun at him. And he shot that man in the white pants.
>
> Q. So the first night that you met him, on the night of the shooting, he had told you that he shot a person in white pants.
>
> A. Yes.
>
> Q. During the course of this investigation, did you determine who the person in the white pants was?
>
> A. I did.
>
> Q. Who was that?
>
> A. Jorge Salame.

N.T. Bench Trial, 5/20-24/19, at 208-09. During this discussion with Detective Uczynski, Appellant expressed uncertainty as to whether he hit anyone. "He said he may have fired one to two shots. He even said he may have shot himself. He was not sure." *Id.* at 210.

On direct appeal, we rejected Appellant's argument that the Commonwealth failed to disprove self-defense beyond a reasonable doubt, because the Commonwealth proved that Appellant was the aggressor.[1] We noted that Appellant "provoked the initial confrontation … [by] arriv[ing] in an angry and agitated state." **Marrero-Cruz,** 1648 MDA 2019, unpublished memorandum at *6. We cited the testimony of Luis, who told the trial court that his hands were in the air when Appellant shot him. **Id.** at *7. We also adopted the trial court opinion's statement that "there was no testimony by any witness, and the video of the incident d[id] not show[] that [Jorge] had a gun at any point." **Id.** (quoting Trial Court Opinion, 12/3/19, at 4) (first bracketing in original).

Appellant unsuccessfully petitioned the Supreme Court of Pennsylvania for review by order dated December 16, 2020. **Commonwealth v. Marrero-Cruz**, 242 A.3d 1248 (Pa. 2020) (*per curiam*). Appellant thereafter filed a timely PCRA petition, and the PCRA court held evidentiary hearings on June 28th and July 19th of 2022. Appellant called a total of four witnesses, and we summarize the pertinent aspects of their testimony.

The first witness was Jose Alvarez, who offered character testimony regarding Appellant's community reputation for peacefulness and non-violence. He did not witness the shooting.

---

[1] Appellant was convicted of aggravated assault, simple assault, recklessly endangering another person, and possessing an instrument of crime.

- 4 -

The remaining three witnesses were fact witnesses, beginning with Appellant's wife, Marilyn Rodriguez. She testified that William came home to report his confrontation with Gordo. Then, she and Appellant, both carrying firearms, drove to Glenside in one vehicle while William and another son, Marlon, followed in a separate car. Upon arrival, Luis approached their vehicle and was acting "crazy. He was arguing, telling [Appellant] that he was going to kill [Appellant] and our children." N.T., 6/28/22, at 24. She stated that Appellant attempted to defuse the situation, telling Luis "that he didn't want to talk to him, that he came to talk to [Gordo]." *Id.* The situation escalated when Jonathan Salame "came out of nowhere" and "pushed [Appellant] to the ground." *Id.* at 25. According to Ms. Rodriguez, Luis and Jonathan Salame began pummeling Appellant with their guns while trying to take away Appellant's firearm. She heard a gunshot and the men scattered, with Appellant visibly bleeding. Turning to the gunshot that left Jorge paralyzed, Ms. Rodriguez recounted the following version of events:

A. Well, I see [Appellant] on the ground. He is bleeding from one arm, from the head. Then Jonathan ran away bleeding from one hand. And then I heard [Jorge] screaming at [Appellant,] telling [Appellant] that [Appellant] shot at him.

Q. Did you hear any other gunshots after you heard the first shot?

A. Yes.

Q. Do you recall how many?

A. It was many.

Q. Okay. Now, backing up, while Jonathan, Luis, and [Appellant] were on the ground, did you ever see your husband point a weapon at [Jorge]?

A.  No.

* * *

Q.  Okay.  Now, after [Jorge] is saying that [Appellant] shot him, what happens next that you saw?

A.  [Appellant] tells him, 'No.'  Don't bring up the weapon because he didn't shoot anyone.  That his bullets are complete.

Q.  Meaning that his weapon didn't fire a single shot.  Is [*sic*] what you heard [Appellant] saying?

A.  Yes.

Q.  Okay.  After that is done, after [Appellant] says that, do you see [Jorge] pick up a firearm?

A.  Yes.  He was already bleeding, but he picked up the weapon.

Q.  And what did he do with that firearm?

A.  He pointed it at [Appellant].

Q.  Did he say anything when he was pointing it at [Appellant]?

A.  He keep [*sic*] repeating that he was the one that shot at him, that he shot him once.

Q.  Did he ever make any threats against [Appellant]?

A.  He was saying that he shot at him and that he was going to kill him.

Q.  And in response to hearing that, what did your – did you see what [Appellant] did?

A.  [Appellant] picked up the firearm.

Q.  Okay.  In response to [Jorge] saying, ["]I'm going to kill you[,"] and pointing the firearm at [Appellant], what happened next?

A.  My husband fired his weapon.

Q.  Okay.

* * *

Q. Did you see that round hit [Jorge]?

A. No.

*Id.* at 26-29.

Appellant's third witness was Carlos Herrera-Torres, who witnessed the events while inside a vehicle from about 20 feet away. Mr. Herrera-Torres and his girlfriend[2] drove through the parking lot of Glenside Apartments as he "wanted to see something." *Id.* at 46. While driving, he "saw [Appellant] telling [Luis] to put away his weapon." *Id.* at 47. He saw that Luis had a firearm and he "heard [Luis] threatening [Appellant]'s life." *Id.* at 48. He saw Jonathan tackle Appellant and the ensuing struggle on the ground. During that struggle, he "heard one gunshot." *Id.* at 50. At that point, people started running. Mr. Herrera-Torres stayed in his vehicle and, like Ms. Rodriguez, he heard "[Jorge] saying to [Appellant] that [Appellant] shot him. [Appellant] replie[d] back, 'My gun hasn't shot one bullet.'" *Id.* at 51. Unlike Ms. Rodriguez, however, he did not see or hear Appellant shoot Jorge. ("Q. [Y]ou never saw this gentleman fire a shot at [Jorge] from where you were seated in your vehicle, correct? A. No. I couldn't see."). He confirmed that the only gunshot he heard came while Appellant, Jonathan, and Luis were struggling on the ground:

---

[2] Appellant's brief also discusses a statement by Mr. Herrera-Torres' girlfriend, Migdalia Gonzalez, which was apparently consistent with Mr. Herrera-Torres' account. As she did not testify at the PCRA proceedings, we do not further discuss her version of events.

Q. All right. So Jonathan comes running up, and then did you actually see them with your own eyes struggling on the ground?

A. Yes. That I saw with my own eyes.

Q. When they were struggling, is that when you heard the first gunshot?

A. Yes.

Q. All right. And then[,] if I remember correctly[,] [on direct examination] you used your hands and you kind of spread them apart and said, ["]Everybody spread out[]?"

A. Yes.

Q. Okay. After that, did you hear any more gunshots?

A. No. After that, I didn't hear no gunshot [*sic*].

Q. All right. So you only heard one gunshot then?

A. Only heard one gunshot.

*Id.* at 55-56.

Appellant's final witness was his son, William. As with the previous two witnesses, William saw Jonathan tackle Appellant. William saw a gun drop during the tackle, and "Gordo picked it up. And as soon as that shot went off, [Gordo] started shooting in my direction." N.T., 7/19/22, at 15. At that point, William "shot back in his direction." *Id.* at 16. He related the following account of Jorge being shot:

Q. Okay. After you have fired your shots in response and this struggle was happening, what happens next? Who is saying – is there anything being said or what do you see?

A. Jonathan ran off bleeding, and then [Jorge] was on the ground screaming at my dad telling him, "Oh, you shot me." And my dad is telling him, "I didn't shoot. Like I didn't – I didn't shoot any bullets out of my gun."

- 8 -

* * *

Q. After that, from your position in the vehicle, did you see [Jorge] do anything else?

A. Well, when I was sitting down and my dad was walking up to him, he like – from the side of his like leg, he lifted a gun. And that was when my –

Q. When you say he, who do you mean?

A. [Jorge, Jorge].

Q. Lifted a firearm?

A. Yes.

* * *

Q. And where did he point it?

A. At my dad.

Q. And in response to that, what did your – what did you see [Appellant] do?

A. He left off a shot.

Q. Did he shoot [Jorge] or did he shoot around [Jorge]?

A. He shot around him. He shot like towards him, but not at him.

*Id.* at 16-17.

On October 13, 2022, the PCRA court denied Appellant's petition in a joint order/opinion, concluding that Appellant failed to establish that PCRA counsel was ineffective. The PCRA court reasoned that counsel reasonably failed to discover Mr. Herrera-Torres, as trial counsel had reviewed the surveillance video with Appellant and Ms. Rodriguez, neither of whom "volunteered information, or otherwise indicated to trial counsel, that they knew any of the other people on the video, or specifically that their friend,

Carlos Herrera-Torres, saw the incident from his car, had helpful information[,] and was willing to testify." Order/Opinion, 10/13/22, at unnumbered 5.

Both Ms. Rodriguez and William, on the other hand, were known to trial counsel. The PCRA court concluded that counsel established a reasonable strategic basis for failing to call these witnesses. As to William, the PCRA court noted that William's testimony would have undermined his then-ongoing appellate proceedings. Additionally, "[t]rial counsel was credible when he stated that even if [William] communicated that he wanted to testify at his father's trial, that trial counsel would have had a conversation about conflicts of interest[.]" *Id.* The PCRA court credited trial counsel's opinion that "there certainly would have been questions as to whether [William] would have been an effective witness." *Id.* at unnumbered 5-6.

Turning to Ms. Rodriguez, the PCRA court concluded that Appellant was not prejudiced by her omission from trial as there must be "some positive demonstration that the testimony would have been helpful to the defense." *Id.* at unnumbered 6. "As to calling Ms. Rodriguez, as a fact witness, trial counsel testified that he felt she added nothing that was not in the video, and her testimony would be inappropriate." *Id.*

Finally, addressing Mr. Alvarez' character testimony, the PCRA court considered this witness in reference to the trial testimony only, which "d[id] not show that Jorge had a gun at any point." *Id.* at unnumbered 2. "In cases where the failure to present character testimony has been found to be

- 10 -

prejudicial, there is normally a juxtaposition of the credibility of the [d]efendant with that of a witness, in many cases, the victim. Here, [Appellant] chose not to testify at trial." *Id.*

Appellant timely filed a notice of appeal and complied with the order to file a concise statement. He now presents one issue, which comprises three subparts:

1. Whether the PCRA [c]ourt's denial of Appellant's counseled PCRA [p]etition was supported by the record and free of legal error when:

a. The evidence of record demonstrates that Appellant was denied his constitutionally guaranteed right of effective representation due to trial counsel's failure to call character witnesses at trial?

b. The evidence of record demonstrates that Appellant was denied his constitutionally guaranteed right of effective representation due to trial counsel's failure to call/investigate material fact witnesses to substantiate Appellant's affirmative defense of self-defense and raise a reasonable doubt in the mind of the factfinder?

c. The evidence of record demonstrates that Appellant was denied his constitutionally guaranteed right of effective representation due to the trial counsel's failure to call/investigate a material fact witness, Mr. William Marrero-Rodriguez and/or investigate the discharge of gunfire from William Marrero-Rodriguez's vehicle?

Appellant's Brief at 4.

Our standard of review is well-settled:

This Court analyzes PCRA appeals "in the light most favorable to the prevailing party at the PCRA level." *Commonwealth v. Rykard*, 55 A.3d 1177, 1183 (Pa. Super. 2012). Our "review is limited to the findings of the PCRA court and the evidence of record" and we do not "disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error." *Id.*

- 11 -

Similarly, "[w]e grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions." *Id.* (citations omitted). "[W]here the petitioner raises questions of law, our standard of review is *de novo* and our scope of review is plenary." Finally, we "may affirm a PCRA court's decision on any grounds if the record supports it." *Id.*

*Commonwealth v. Rigg*, 84 A.3d 1080, 1084 (Pa. Super. 2014).

The United States Supreme Court has set forth the basic legal framework for resolving a challenge to trial counsel's stewardship:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Our Supreme Court has modified the *Strickland* inquiry into three prongs:

Pennsylvania has recast the two-factor inquiry regarding the effectiveness of counsel set forth by the United States Supreme Court in *Strickland* … as the following three-factor inquiry:

[I]n order to obtain relief based on [an ineffective assistance of counsel] ... claim, a petitioner must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.

- 12 -

***Commonwealth v. Perry***, 128 A.3d 1285, 1289 (Pa. Super. 2015) (citation omitted).

A claim challenging trial counsel's failure to call a witness claim is reviewed under the following test:

> When raising a failure to call a potential witness claim, the PCRA petitioner satisfies the performance and prejudice requirements of the ***Strickland*** test by establishing that:
>
>> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.
>
> ***Commonwealth v. Washington***, … 927 A.2d 586, 599 ([Pa.] 2007). To demonstrate ***Strickland*** prejudice, the PCRA petitioner "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." ***Commonwealth v. Gibson***, … 951 A.2d 1110, 1134 ([Pa.] 2008); ***see also Commonwealth v. Chmiel***, … 889 A.2d 501, 546 ([Pa.] 2005) ("Trial counsel's failure to call a particular witness does not constitute ineffective assistance without some showing that the absent witness' testimony would have been beneficial or helpful in establishing the asserted defense.").

***Commonwealth v. Johnson***, 966 A.2d 523, 536 (Pa. 2009).

## II.

We decline to affirm the order based on the PCRA court's legal conclusions. First, with respect to Ms. Rodriguez, the PCRA court appears to credit Attorney Douglas Breidenbach's testimony that Ms. Rodriguez would not have added anything helpful to the case because the surveillance videos captured all the relevant events. It is clear from the notes of testimony of Appellant's bench trial that the video does not capture what Jorge was doing

when he was shot, nor does it show whether he was armed. This is evident from the cross-examination of Detective Uczynski, who narrated the videos on direct examination:

> Q. Let's put … aside whether the video showed Luis had a gun or not. So when the video shows – you don't know whether Luis had a gun. The video shows when Gordo has a gun, correct, those points?
>
> A. Yes.
>
> Q. You don't see Jorge with a gun?
>
> A. I never saw Jorge with a gun.
>
> Q. You can't tell from the video?
>
> A. That's right.
>
> Q. As to all three, you also can't tell from the video that they did not have guns, correct?
>
> A. I suppose that is fair to say.

N.T. Bench Trial at 238.

Appellant also elicited Detective Uczynski's opinion regarding how Appellant, Luis, and Jonathan were injured during the fight that broke out after Jonathan tackled Appellant:

> Q. So if Luis didn't have a gun and Jonathan did not have a gun during the scuffle, how did the three of them get shot? Do you have any theories on that?
>
> A. My opinion is that Luis had a gun during that struggle, and his gun discharged resulting in the three of them getting shot during that close quarter struggle.

*Id.* at 241. Turning to Jorge's shooting, Detective Uczynski testified as follows:

Q. So still sticking to the video, we know that [Appellant] breaks free and overcomes these two guys. He has been shot, and now he walks off camera to the right of the screen that we see in the video, correct?

A. Yes, that's right.

Q. There is no video to show Jorge at the moment that he is struck by a bullet, correct?

A. Not entirely.

**Q. There is no video that would help us prove or disprove Jorge at that moment held a gun, correct?**

**A. I think that is fair to say.**

*Id.* at 242 (emphasis added).

Thus, the video did not address Ms. Rodriguez' testimony that Jorge pointed a firearm at Appellant. *See also id.* at 295 (Commonwealth's arguing during closing that Appellant's "words that Jorge had a gun is the only instance that shows anything in regards to Jorge having a gun"). Notwithstanding, it may well be that counsel, in his professional judgment, would have chosen not to call Ms. Rodriguez based on, *inter alia*, her obvious bias towards her husband and her role in driving to the scene with her family to confront Gordo. But counsel testified only that "her participation was … visible on the video. So the need to call her as a fact witness was not something that I considered appropriate." N.T., 7/19/22, at 42. Appellant's self-defense claim would have been supported by testimony establishing that Jorge had a firearm, something which is not visible in the video. We therefore cannot agree that trial counsel articulated a reasonable strategic basis for declining to call Ms. Rodriguez.

Turning to Mr. Herrera-Torres, the PCRA court concluded that trial counsel had no duty to investigate this witness because Appellant did not supply his name. We disagree.

> Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary. Counsel's unreasonable failure to prepare for trial is "an abdication of the minimum performance required of defense counsel." The duty to investigate, of course, may include a duty to interview certain potential witnesses; and a prejudicial failure to fulfill this duty, unless pursuant to a reasonable strategic decision, may lead to a finding of ineffective assistance.

*Johnson*, 966 A.2d at 535–36 (citations omitted).

The duty to investigate must be assessed under the circumstances of the case, and we disagree with the PCRA court's conclusion that counsel had no duty to investigate under these facts. Appellant and Attorney Breidenbach chose to pursue a self-defense theory, and Mr. Herrera-Torres' vehicle is apparently observable on video. N.T., 6/28/22, at 44 (Mr. Herrera-Torres' testifying that, during a conversation with Appellant's first attorney, he identified himself on video).[3] We conclude that, under these circumstances, trial counsel had the duty to investigate to see if the eyewitnesses had anything helpful to add to Appellant's defense.

*Strickland* states that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S at 691. Appellant clearly

---

[3] Mr. Herrera-Torres testified that this attorney did not take a statement from him, and it is unclear whether, and to what extent, Attorney Breidenbach spoke to former counsel.

- 16 -

could have told Attorney Breidenbach that Mr. Herrera-Torres may have helpful information. By the same token, trial counsel simply could have asked Appellant if he knew any of the people depicted on video. We conclude that of these two parties, the duty to speak up lies with the attorney, not the client he or she represents. Counsel is required to conduct reasonable investigations, which includes interviewing potential eyewitnesses. "Neglect even to interview available eyewitnesses to a crime simply cannot be ascribed to trial strategy and tactics." *Hoots v. Allsbrook*, 785 F.2d 1214, 1220 (4th Cir. 1986). We therefore do not agree that counsel's performance was not deficient in that regard. However, as explained *infra*, we agree that Appellant has failed to establish all prongs of the ineffectiveness test.

With respect to William, we agree with the PCRA court that there was an obvious potential conflict of interest involved, especially given that Attorney Breidenbach represented both William and Appellant at their separate trials. The PCRA court concluded that Attorney Breidenbach would have had a conversation with William about that conflict had he known of William's testimony. However, trial counsel's testimony that he would have addressed the issue had William told him that he intended to testify does not adequately address Appellant's argument. That conclusion simply tells us what trial counsel would have done had he known William was willing to testify, but it does not tell us anything about whether William would have chosen to waive any conflicts and/or his Fifth Amendment privilege. Our affirmance on an

- 17 -

alternative ground dispenses of the need to address whether William would have testified at Appellant's trial.

Finally, as to the character testimony, explained *infra*, our alternative affirmance also addresses this claim.

**III.**

We affirm the PCRA court's order on the alternative basis that Appellant failed to establish that trial counsel was ineffective for pursuing the chosen self-defense strategy. Appellant takes the conflicting position both that (a) he acted in justifiable self-defense and (b) someone else shot Jorge. The following passage from Appellant's brief illustrates those theories:

> Accordingly, these omissions resulted in substantial prejudice to Appellant in substantiating his affirmative defense of self[-] defense, especially given [t]rial [c]ounsel's advisement that Appellant not testify on his own behalf. In that vein, had the testimony been presented, there is a high likelihood that a reasonable doubt would have been raised in the mind of the factfinder as to the identity of Jorge Salome's shooter and/or successfully raised the affirmative defense of self-defense; this evidence, had it been admitted, would likely result in a different verdict if a new trial were granted.

Appellant's Brief at 41.

The failure to articulate a clear strategy that counsel should have pursued in lieu of the self-defense claim presented at trial is fatal to Appellant's ineffectiveness claim, as a valid self-defense claim required Appellant to admit that he shot Jorge. Thus, Appellant's assertion that "the identity of [the shooter] was never truly substantiated at Appellant's trial" is an irrelevant point if Appellant continues to insist that he shot Jorge in self-defense.

We begin with a review of the legal prerequisites for a valid self-defense claim. Self-defense is a statutory entitlement, as set forth by Section 505 of the Crimes Code:

> **(a) Use of force justifiable for protection of the person.**-- The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> **(b) Limitations on justifying necessity for use of force.**--
>
> ...
>
> (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:
>
>> (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or
>>
>> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505.

Our decisional law views a valid self-defense claim as comprising three elements:

> (1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (2) the defendant was free from fault in provoking the difficulty which culminated in his use of deadly force; and (3) the defendant did not violate any duty to retreat.

*Commonwealth v. Steele*, 234 A.3d 840, 846 (Pa. Super. 2020).

As our Supreme Court explained in *Commonwealth v. Mouzon*, 53 A.3d 738, 752 (Pa. 2012), the first element is further broken down into "two aspects, one subjective and one objective." The subjective inquiry asks whether the defendant had an "honest, bona fide belief that he was in imminent danger[.]" *Id.* Notably, the subjective component does not require that the defendant testify; in *Mouzon*, the defendant "rel[ied] instead on inferences from the circumstances as observed by others." *Id.* Objectively, the subjective belief "must be reasonable in light of the facts as they appeared to the defendant…." *Id.*

Trial counsel chose to pursue a straightforward case of self-defense presented without calling Appellant to the stand. Appellant now faults counsel for failing to pursue mutually exclusive alternatives. Arguing alternative legal theories is not in and of itself problematic in most cases. For example, a defendant facing a charge of possessing controlled substances with the intent to deliver can argue that he or she did not possess the drugs, and, alternatively, that if the fact-finder finds the element of possession, that said possession was not with an intent to deliver. However, self-defense does not lend itself to this type of in-the-alternative approach. In the drug example, those alternative theories speak to the Commonwealth's duty to establish all elements of the crime beyond a reasonable doubt. Self-defense differs in that it acts as a justification for the use of force, and the defendant is entitled to acquittal if the Commonwealth fails to disprove it beyond a reasonable doubt.

*Commonwealth v. Rivera*, 983 A.2d 1211, 1218 n.6 (Pa. 2009) ("[T]he affirmative defense of self-defense … is a justification for the crime and, if accepted, results in acquittal…."). The lawful use of deadly force establishes that no crime has occurred, as the actor was justified in their actions.

As stated in *Mouzon*, the defendant is not required to testify to establish the subjective component of a self-defense claim through his own testimony. Still, the actor cannot claim that the injury was accidental. Indeed, in *Commonwealth v. Harris*, 665 A.2d 1172, 1175 (Pa. 1995), our Supreme Court held that a defendant was not entitled to a self-defense instruction because he did not admit to shooting the victim. Instead, the victim claimed that the firearm discharged accidentally. "[W]hen he took the stand and denied that the shooting was intentional and, instead, said it was caused by mistake or accident as he backed up the stairs, he denied that the act was done intentionally in defense of self." *Id.*

*Harris* establishes that Appellant's PCRA claim that trial counsel was ineffective for not pursuing a mixed strategy of both admitting and denying that Appellant shot Jorge is a nonstarter. The difference between the claim in *Harris* that the gun accidentally discharged versus Appellant's claim that he did fire the gun but may not have hit Jorge is rather negligible. In both cases, there must be a definitive concession that deadly force was intentionally employed. A defendant is not required to offer testimony to support the subjective intent, but this does not extend to denying the factual predicate for a self-defense claim. Appellant cannot pick and choose which facts support a

self-defense claim, while simultaneously arguing that someone else must have shot Jorge.

On this point, we note that Appellant was convicted of aggravated assault, which may be established by proof of either an intentional act or a reckless one. 18 Pa.C.S. § 2702(a)(1) (stating that person is guilty of aggravated assault if he causes serious bodily injury "intentionally, knowingly or recklessly…"). Had Appellant fired at Jorge in valid self-defense, but accidentally struck someone else, then doctrinal complications arise. *Compare Commonwealth v. Fowlin*, 710 A.2d 1130, 1137 (Pa. 1998) (holding that "a person who unintentionally injures a third[-]party bystander while using justifiable force in self-defense" is not criminally liable), *with Commonwealth v. McClendon*, 874 A.2d 1223, 1232 (Pa. Super. 2005) (suggesting that *Fowlin's* holding is fact-intensive, as the case involved an innocent bystander at a bar who was ambushed by three people and was maced to near blindness). But that problem does not arise here, as Appellant is not charged with injuring a third party.

Relatedly, the fact that this is a one-victim case is significant, as demonstrated by *Commonwealth v. Scott*, 73 A.3d 599 (Pa. Super. 2013), in which this Court granted a new trial due to the trial court's failure to instruct on both self-defense and mistake-of-fact in an unusual fact pattern involving two victims. The appellant, Dustin Scott, was at Bill Ledford's apartment with several other people, "smoking, snorting, and injecting bath salts, a lawful practice at the time." *Id.* at 601. A man named Jeremiah Shoop had

attempted to burglarize Scott's home the night before and Shoop had made threats against other members of the group. At some point, Shoop arrived at the apartment, and "began yelling threats … and tr[ying] to pry the front door open." *Id.* Shoop eventually broke in and, during the chaos, someone turned out the lights. Ledford yelled, "'They're in' and 'shoot, shoot!'" *Id.*

Scott, who was on the ground, saw a silhouetted figure with a gun. Believing this man to be Shoop, Scott fired and shot at the figure. It turned out that the man was one of the men he had been partying with, Josh Lemin. Scott was charged with the attempted murder of Shoop and aggravated assault of Lemin. The trial court instructed the jury on self-defense as to Shoop but refused to give an instruction on mistake-of-fact as to Lemin. We held that this was erroneous. "[T]he trial record indicates that a reasonable jury could have concluded that [Scott] shot at Shoop intentionally, warranting a self-defense charge, but shot at Lemin mistakenly, warranting a mistake-of-fact charge. Quite obviously, the defenses are not mutually exclusive under these circumstances." *Id.* at 604.

Unlike **Scott**, this case does not involve separate, alternative defense theories with respect to separate victims, as Appellant was not convicted for striking an unintended victim. In other words, if Appellant maintains that he shot in self-defense but did not actually hit anyone, then the self-defense claim is nonsensical; if his bullet struck no one then Appellant is guilty of nothing. Accordingly, Appellant's alternative theory that someone else shot Jorge is mutually exclusive of his claim that he shot in self-defense.

In terms of the PCRA and his burden to establish trial counsel was ineffective, Appellant has failed to show that it was unreasonable for trial counsel to focus on self-defense, instead of pursuing mutually exclusive defense theories. "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Commonwealth v. Howard*, 719 A.2d 233, 237 (Pa. 1998). Appellant's complaint that trial counsel should have pursued a defense that the law does not permit cannot possibly meet this standard. In fact, even where an alternative strategy is not prohibited by law, an attorney's decision to focus on one defense over the other is arguably not subject to challenge. *See, e.g., Dill v. Allen*, 488 F.3d 1344, 1357 (11th Cir. 2007) ("In light of the reasonableness standard set forth by the *Strickland* Court, our circuit maintains that constitutionally sufficient assistance of counsel does not require presenting an alternative-not to mention unavailing or inconsistent-theory of the case.").

Due to our resolution, we need not specifically address each witness' testimony.[4] We will not parse out aspects of the testimony that would be

_____

[4] The fact that Appellant presented a character witness demonstrates the confusing nature of Appellant's complaint with trial counsel's performance. Appellant explains that evidence of his character would be relevant for these reasons:

*(Footnote Continued Next Page)*

relevant towards a claim that the bullet fired by Appellant did not strike Jorge versus those facts that implicate a justifiable use of deadly force. Appellant could have attempted to show that the sufficiency-of-the-evidence claim concerning who shot Jorge was so strong that counsel's decision to pursue a self-defense claim was constitutionally unreasonable. Alternatively, Appellant could have limited his claim to an assertion that the witnesses should have been called to support the self-defense theory offered at trial. What he cannot do is try to argue both.

Finally, we observe that while Appellant was not required to testify at trial to establish the subjective component of his self-defense claim, he declined to testify at the PCRA hearing, too. Our Supreme Court's statement

---

Jorge Salome explicitly indicated that he did not see which individual shot him, calling the identity of Appellant as the shooter into question, and further compounding the importance of calling character evidence on Appellant's behalf.

\*\*\*

As the [t]rial [c]ourt wrestled with this difficult determination[,] it was deprived of the opportunity to consider Appellant's reputation for being peaceful and law abiding when deciding if Appellant had a subjective, reasonable belief that he was in fear of death or serious bodily injury, and equally as important in determining Appellant's 'intent' as required for conviction.

Appellant's Brief at 32.

Appellant does not explain why character testimony would be relevant to the self-defense claim. It is the objective circumstances and a *bona fide* subjective fear which give rise to a valid self-defense claim, not the character of the defendant. Whether Appellant is a peaceful, nonviolent person or not has no bearing on whether the elements of a valid self-defense claim have been met.

- 25 -

in **Mouzon** that the "failure to offer any evidence to support the subjective aspect of his claim of self-defense highlights the difficulties associated with assigning the Commonwealth the burden to disprove a defense where necessary facts are peculiarly within the knowledge and control of the defense," **Mouzon**, 53 A.3d at 752 n.10, has increased relevance in this collateral proceeding where Appellant bears the burden of establishing that counsel was ineffective. Appellant has twice declined to offer evidence regarding his subjective account of the event.[5] Paired with his presentation of evidence and legal arguments that both support and undermine a self-defense claim, we conclude that Appellant has failed to establish that counsel was ineffective in selecting a strategy that raised the issue of self-defense while avoiding contradictory and confusing testimony about who shot whom. We therefore affirm the PCRA court's order on this alternative basis.

Order affirmed.

Judge Sullivan joins this memorandum.

Judge McLaughlin concurs in the result.

_____

[5] As previously quoted, Appellant claims that the failure to call these witnesses "resulted in substantial prejudice to Appellant in substantiating his affirmative defense of self[-]defense, especially given [t]rial [c]ounsel's advisement that Appellant not testify on his own behalf." Appellant's Brief at 41. Appellant does not otherwise develop that point, and, in any event, he chose not to testify during collateral proceedings.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/25/2023